THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EARL ROBINSON, Defendant-Appellant.

First District (5th Division)   No. 82—2702

Opinion filed March 2, 1984.

Steven Clark and Scott Graham, both of State Appellate Defender's Officer, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and James J. Pink, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was convicted and sentenced to concurrent, extended terms of 60 years for attempted murder, armed robbery, and armed violence. On appeal, he contends that (1) he was denied a fair trial by the prosecutor's (a) insinuation during cross-examination that he committed other crimes, and (b) improper comments during closing arguments; (2) he was improperly convicted of multiple crimes arising from a single act; and (3) the sentences im-

posed are excessive.

At trial, Ronald Stearney testified that he was in the men's room near his law office at 180 North La Salle Street on January 29, 1982, when defendant emerged from one of the stalls, and his attention was drawn to defendant because he was poorly dressed. Stearney watched him walking across the room and as they stood side by side at the sinks where defendant washed his hands and brushed his hair. Upon leaving the sink defendant walked behind him in the direction of the door, and Stearney suddenly felt a terrific blow to his head. He turned and began struggling with defendant, pushing him against the wall. Defendant then struck him several more times about the head and face. After he fell to the floor and began calling for help, defendant continued striking him, saying "I'm going to kill you, _____." Defendant struck him eight or nine times and then fled, taking his wallet and watch. Stearney also testified that immediately after undergoing emergency surgery for his injuries, he identified defendant as his attacker from a photographic array of five pictures shown to him by police officers.

Arthur Engelland testified that when he entered the washroom he saw Stearney lying on the floor, covered with blood, and noticed a cap and gloves on the floor. Stearney was coherent and described his attacker as a black man, approximately six feet tall, weighing 180 to 190 pounds, and wearing a dark jacket.

Cassandra Allen testified that she was in the hall outside the washroom when she heard a man screaming for help and, upon looking in, she saw Stearney lying on the floor. A black man in a dark coat, who was bending over him, then ran past her in the hall carrying a plastic bag under his arm. Allen identified the coat and plastic bag, which were State exhibits, as the same coat and bag she saw at the time of the incident.

Cedric Wright testified that upon entering an elevator at 180 North La Salle Street on the afternoon in question, he found a coat and a hammer wrapped in a plastic bag on the floor. Both items were covered with blood, and he turned them over to a building security officer.

Further testimony from other witnesses established that there was human blood, Type 0, the same as that of the victim, on the items found by Wright, as well as the cap and gloves found in the washroom, and that a letter written by defendant and bearing his name and address was in the pocket of the coat found by Wright in the elevator. It was further established that the victim's wallet was recovered shortly after the incident from a trash basket at Lake and

Clark, one block from the scene of the crime.

Assistant State's Attorney Susan Fleming testified that she interviewed defendant at approximately 9:10 p.m. on February 4, 1982, in the presence of Detectives Glynn and Reagan. After he was read his *Miranda* rights and acknowledged his understanding of them, defendant agreed to give a statement. He then told her that he went downtown on January 29 to "do some stealing." After taking two calculators from an office building on Monroe Street, he proceeded to 180 North La Salle Street, where he found a claw hammer near a construction area in the lobby. He took the hammer and placed it in a plastic bag because "it might come in handy for some stealing," then went to an upper floor and entered a washroom. When he emerged from one of the stalls where he had gone to examine the stolen calculators, he noticed a man standing at the sink. He walked a few steps past him, then turned and hit him three or four times with the hammer in order to rob him. They struggled and, when the man passed out, he took his wallet and watch. He left his hat and gloves in the washroom and abandoned his coat and the plastic bag containing the hammer on the elevator because they were bloody. Once outside the building, he discarded the wallet and took a bus to 47th Street where he sold the watch. Fleming acknowledged that shortly after the interview began, defendant appeared to be in pain, and when asked what was wrong, stated that he was injured at the time of his arrest. She asked if he wanted to see a doctor or go to the hospital, but he refused. She did not notice any blood or bruises on him at that time.

Officer Posilovich testified that on February 4, 1982, he and three other officers proceeded to an address on South Federal with a warrant for defendant's arrest. They found him hiding under a cot in a rear bedroom and, when they moved the cot, defendant bolted for the door. The officers tackled him, handcuffed him, and transported him to the police station where they arrived at approximately 6:30 p.m.

Detective Glynn testified that once at the station and after being informed of his *Miranda* rights and acknowledging understanding of them, defendant agreed to answer questions when he learned that the victim had identified him. Glynn related the substance of defendant's statement, which was substantially the same as the statement later given to the assistant State's Attorney. On cross-examination, Glynn stated that he went to the address shown on the letter and interviewed the resident of that apartment, Kathleen York. She told him that defendant had been living with her, and she recognized the letter because she helped him write it. However, she had not seen defendant for approximately one week prior to the incident because they had a

disagreement. Over the State's objection, Glynn further testified on cross-examination that York told him she asked defendant to leave because she believed that he had stolen some property from her.

Dr. Gutierrez, a neurosurgeon who treated the victim, testified that Stearney suffered two depressed skull fractures, a fractured nose, and multiple lacerations on his head and face. Surgery was performed immediately to remove two pieces of bone in order to relieve the pressure on his brain caused by the depressed fractures. Further surgery would be necessary to replace the fragments removed with pieces of bone taken from the victim's rib or hip; however, Stearney suffered no permanent neurological injury as a result of the incident.

Defendant testified that he had five prior felony convictions for burglary—two in 1975 and one each in 1976, 1979 and 1980. When he was paroled in June 1981, he went to live with his girl friend, Kathleen York. She knew that he was married, but did not know that he was still corresponding with his wife. When she found the letter he had written, they argued, and he left the apartment after placing the letter in another room. When he returned the next day, he discovered that York had thrown out all of his clothes and wanted him to leave. Among the items she discarded was the coat which was later found in the elevator at 180 North La Salle Street.

Defendant further stated that he did not commit the crimes charged; however, he panicked when he learned that the police were looking for him and decided to hide at a friend's apartment. When officers came to arrest him, he hid under a bed, but emerged when ordered to do so and did not try to escape. Those officers handcuffed him and took him to the police station where he was placed in an interview room and handcuffed to the wall. Officer Glynn entered and asked him what he knew about the robbery; when he denied any knowledge, Glynn and another officer kicked and hit him repeatedly about the face, stomach, chest and genitals. This went on for over an hour before he finally confessed to what they said he did. By that time he was bleeding from the mouth, nose, and ears and was in a great deal of pain. Later, when he spoke to the assistant State's Attorney, he merely repeated to her the details which the officers supplied when questioning him, and refused her offer of medical treatment because he was afraid the officers would beat him again. After giving the statement, he was placed in the lockup and several hours later was taken to the hospital where he was examined and released after 45 minutes. Defendant denied that York asked him to leave because he was stealing from her. He stated also that he could not remember what the police said while beating him, and that the assistant

State's Attorney did not offer him medical treatment. It was stipulated at the pretrial suppression hearing that at the hospital he complained of pain on respiration or breathing, but the examining doctor observed no bruises or abrasions.

OPINION

■ Defendant first contends that he was denied a fair trial by the prosecutor's question regarding the reason York ejected him from her apartment. He asserts that the question, which insinuated that she asked him to leave because he was stealing from her, served merely to introduce evidence of other crimes which invited the jury to convict him regardless of the evidence presented.

Initially, we note that since defendant did not object to the question at trial nor raise it in his post-trial motion, the issue is waived for purposes of review (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Newbury* (1972), 53 Ill. 2d 228, 290 N.E.2d 592) and, given the overwhelming testimony establishing defendant's guilt, we do not believe that the evidence is so closely balanced as to warrant consideration under Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a); see *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233). It is further our view that, even if the objection thereto had not been waived, the question complained of is not so prejudicial as to require reversal. As we have repeatedly noted, any impropriety in suggesting that a defendant has committed other, unrelated crimes is harmless where the evidence otherwise shows that the defendant is guilty beyond a reasonable doubt. See, *e.g., People v. Bynum* (1981), 102 Ill. App. 3d 461, 430 N.E.2d 110; *People v. Dallas* (1980), 85 Ill. App. 3d 153, 405 N.E.2d 1202, *cert. denied sub nom. Cooper v. Illinois* (1981), 450 U.S. 1000, 68 L. Ed. 2d 202, 101 S. Ct. 1708.

Here, the complaining witness, who had a clear view of his assailant for a substantial period of time, was not only able to describe defendant immediately after the incident, but positively identified him both at trial and from a photographic array shown to him within hours of the crime. In addition, defendant was linked to the crime not only by his coat and a letter written by him, but by his own inculpatory statements. Moreover, defendant's testimony that his statements were the result of physical coercion was thoroughly negated. He stated that after a brutal beating by police officers using their feet and fists, he was bleeding from the nose, mouth, and ears; yet, an assistant State's Attorney who saw him half an hour later noted that there were no bruises or blood evident, and her testimony is corroborated by a picture of defendant taken after the second statement. We

note also that the examining doctor at the hospital observed no bruises or abrasions on his body; that he told the assistant State's Attorney, contrary to his testimony at trial, that he was injured at the time of his arrest; and that this is corroborated by the testimony of Officer Posilovich, who said that defendant was tackled by four officers when he tried to escape. Finally, it appears that defendant gave conflicting testimony on a prior occasion; for example, he attempted to explain his knowledge of the crime by asserting that the police supplied the details thereof during the initial interview, yet he testified at another time that he could not remember what was said during that session. In view thereof, we believe that any impropriety in the question asked was harmless, particularly when the jury had already been informed through testimony elicited by defense counsel that York asked defendant to leave because she thought he was stealing from her.

Defendant also contends that he was deprived of a fair trial by improper arguments, including an appeal to the jury's general fear of crime which disparaged him and his counsel, and arguments based on testimony not in evidence. He acknowledges that no objection was made to any of the comments complained of, but urges us to consider them under the plain error exception of Rule 615(a), citing *People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298.

The purpose of requiring a defendant to object at trial is to insure that alleged errors are brought to the trial court's attention so that they may be corrected, obviating the need for reversal on appeal (*People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739), and Rule 615(a) is not a general savings clause relieving a defendant of that obligation (*People v. Precup* (1978), 73 Ill. 2d 7, 16, 382 N.E.2d 227, 231); it is a very limited exception (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856), to be invoked only where the evidence is so closely balanced that it might be said that the jury's verdict may have resulted therefrom (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233) or the prejudice to defendant's rights is of such magnitude that fundamental fairness has been denied (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331). Thus, in *People v. Starks*, upon which defendant relies, this court did employ the plain-error rule to reverse a conviction where we found that the defendant had been denied a fair trial by the repeated improper arguments of the prosecutor, noting that the evidence was not so overwhelming that it could not be said that the jury's verdict was not influenced by the prosecutor's conduct. However, courts have repeatedly refused to invoke the plain error doctrine where it could not be said that the verdict would have been otherwise

had the improper remarks not been made. *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739; *People v. Buford* (1982), 110 Ill. App. 3d 46, 441 N.E.2d 1235.

As noted above, the evidence here is not so closely balanced factually as to prompt us to invoke the plain error doctrine. Moreover, we have examined the arguments in question, and we find that they were either invited by defense counsel's argument or were fair inferences drawn from the evidence. In any event, we do not believe that the verdict would have been different in the absence of the arguments complained of, and therefore reversal is not required under the plain-error rule.

■ Defendant further contends that he was improperly convicted of multiple offenses arising from the same physical act, citing *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, and asks that we vacate the three convictions for aggravated battery and the three convictions for armed violence.

■ In entering sentence, the trial court ruled that the aggravated battery counts merged with the attempted murder conviction, apparently finding that they arose from the same physical act, *i.e.*, the beating inflicted upon the victim. The State does not dispute this finding, and since there can be but one conviction where the crimes arose from a single act, the aggravated battery convictions will be vacated. (See *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.) The State also concedes that the verdict of armed violence, based on either attempted murder or armed robbery, must be vacated. In *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477, the supreme court held that a conviction for both armed violence and its underlying felony cannot stand, and judgment should be entered and sentence imposed only on the more serious offense. Here, since all three are Class X felonies (see Ill. Rev. Stat. 1981, ch. 38, pars. 8–4(c)(1), 18–2(b), 33A–3), it is appropriate to vacate the conviction and sentence for armed violence.

■ Defendant also asserts that because we are vacating a number of convictions, we must remand the cause for resentencing, maintaining that the trial court considered those convictions in imposing maximum extended-term sentences for attempted murder and armed robbery. In support of his position, he cites *People v. Filker* (1981), 101 Ill. App. 3d 228, 427 N.E.2d 1311, and *People v. Walton* (1981), 94 Ill. App. 3d 903, 419 N.E.2d 495, wherein this court remanded for resentencing upon vacation of several convictions, noting that the trial court might have considered the total number of convictions in imposing sentence. However, we also have held that remand is unnec-

essary where a defendant has been sentenced separately on each conviction and there is no indication that the vacated conviction was considered in sentencing the defendant on the remaining convictions. (*People v. Hines* (1982), 105 Ill. App. 3d 35, 433 N.E.2d 1137.) In the instant case, the trial court stated in imposing sentence:

> "The evidence and the jury verdicts show that you, Earl Robinson, viciously wielded your hammer of evil to further your greed and to cause near death of the victim in this case. I now respond with the piercing sword of justice, convinced that I all but end your career of crime and send a message to others that conduct as vicious and heinous as to cause the crushed skull of Mr. Stearney or other victims such as he, will not be tolerated. Accordingly, I extend the term as to attempt murder and sentence you to sixty years \*\*\*. I extend the term as to armed robbery and sentence you to sixty years \*\*\*. I extend the term as to armed violence and sentence you to sixty years \*\*\* and order that all terms are to run concurrent, and that the aggravated battery charge hereby merges with the attempt murder sentence."

Thus, defendant was sentenced separately on each conviction, and it is clear that the extended terms were imposed because the trial court found that the crimes were committed in a heinous and brutal manner. There is nothing in this record from which we could conclude that the trial court gave any consideration to the number of charges made or convictions entered in imposing sentence. Under these circumstances, we do not believe that a further sentencing hearing is required.

■ Finally, defendant contends that the sentence imposed is excessive and asks that it be reduced pursuant to Supreme Court Rule 615(b)(4); or, in the alternative, that we remand for resentencing. He acknowledges that the determination of the sentence is a matter of judicial discretion which will not be disturbed absent an abuse thereof (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344), and we note that "in this State, the spirit and purpose of the law are upheld when a sentence reflects the seriousness of the offense and gives adequate consideration to the rehabilitative potential of the defendant" (*People v. Carlson* (1980), 79 Ill. 2d 564, 587, 404 N.E.2d 233, 243). Defendant argues that there was an abuse of discretion here, maintaining that the trial court improperly imposed a sentence which removes all hope of rehabilitation. In support of his position, he cites *People v. Rickard* (1981), 99 Ill. App. 3d 914, 425 N.E.2d 1317, wherein we reversed a sentence of 100 to 300 years for murder, find-

ing that such a sentence negated any possibility of rehabilitation and, under the circumstances of that case, was an abuse of discretion.

We find *Rickard* readily distinguishable. There, the defendant, who was 32 years old, as is the defendant here, had no prior criminal history and had an excellent educational and employment history. In the instant case, defendant admitted that he was a heroin addict who turned to crime to support his addiction. His record reflects five prior felony convictions in Illinois, dating back to 1971, and during the sentencing hearing it was revealed that defendant had another felony conviction in Mississippi during that period. We also note that, at the time of this attack, defendant had been on parole from his last conviction for less than eight months. It appears to us that these circumstances are similar to those in *People v. Buford* (1982), 110 Ill. App. 3d 46, 56, 441 N.E.2d 1235, 1243, where we noted:

> "It is true that the court's range of discretion in fixing a sentence permits a recognition of the rehabilitative potential of the defendant. [Citation.] However, it can hardly be contended that defendant's potential for rehabilitation was not considered by the trial judge where, as here, the evidence concerning the violence of the crime committed and the defendant's extensive record of prior convictions speak so eloquently to that very factor."

We believe that here, too, the sentence, although lengthy, is reflective not only of the seriousness of the offense but of the defendant's already proven lack of rehabilitative potential.

For the foregoing reasons, we affirm the convictions and sentences for attempted murder and armed robbery, vacate the conviction for aggravated battery, and vacate the conviction and sentence for armed violence.

Affirmed in part; vacated in part.

LORENZ and WILSON, JJ., concur.